[S. F. No. 10678. In Bank.—September 20, 1923.]

CALIFORNIA HIGHWAY COMMISSION et al., Petitioners, v. RAY L. RILEY, as Controller of the State of California, Respondent.

[1] CALIFORNIA HIGHWAY COMMISSION—AUTHORITY TO CANCEL AGREEMENTS—EXPENDITURE OF FUNDS.—The California Highway Commission has not authority and power to cancel by agreement a valid and subsisting contract for the construction of a state highway, and it is not authorized to expend state highway funds for such purpose.

192 Cal.—7

[2] ID.—AGENCY—SCOPE OF AUTHORITY—CONTRACTS—BREACH OF.—A grant of authority to an agent to execute a contract in behalf of his principal contemplates the performance of such contract, not its breach, and authority to breach a contract is not implied from a mere grant of authority to execute such contract.

[3] CONTRACTS—STATE—INDIVIDUALS—RULE.—The rule that a state in its contract with individuals is subject to the same rules and liabilities as individuals is itself subject to certain limitations. When an individual enters into a contract he is a mere agent and may determine for himself whether he will continue therewith or stand the damages for a breach thereof, or he may by agreement with the other party modify or abrogate the same; but when the state empowers an officer or board to enter into a contract on its behalf, whereby it is to have certain rights and liabilities, and the officer or board has entered into such contract, no officer or board may thereafter act or speak for the state in the matter of such contract, either for the enforcement or termination thereof, unless expressly or impliedly authorized by the state so to do.

[4] CALIFORNIA HIGHWAY COMMISSION — CANCELLATION OF CONTRACTS —USE OF FEDERAL FUNDS.—The California Highway Commission cannot use funds contributed by the federal government for maintenance and repair of highways for the purpose of procuring cancellation of a contract executed for the construction of a state highway.

[5] ID.—FEDERAL FUNDS—WHERE DEPOSITED.—The legislation authorizing the California Highway Commission to designate the funds into which moneys contributed by the federal government should be paid contemplated that it should be paid in the funds which, under the statute organizing said board, are under the control of that board for the creation, maintenance, and repair of state highways.

[6] MANDAMUS—WHEN GRANTED—DISCRETION.—The writ of mandate is, in a measure at least, a discretionary writ, and it will not be granted where its enforcement would work an injustice or accomplish a legal wrong, and it will not issue to compel an auditor to draw his warrant for an illegal claim even though it has been audited and allowed by the board which is charged with that duty and responsibility.

APPLICATION for Writ of Mandate to require the state auditor to audit and draw his warrant for a claim on cancellation of a contract for highway construction. Writ denied.

The facts are stated in the opinion of the court.

Paul F. Fratessa and Fabius T. Finch for Petitioner.

U. S. Webb, Attorney-General, and R. W. Harrison, Deputy Attorney-General, for Respondent.

MYERS, J.—This is an application by the Highway Commission for a writ of mandate to compel the respondent, as state controller, to audit and draw his warrant for the payment of a claim presented to him for such audit and warrant. It is alleged in the petition that on or about August 31, 1922, the California Highway Commission as then constituted entered into a written contract with one Pollock (hereinafter referred to, for convenience, as the "first contract") for the construction of a portion of a state highway in Monterey County between Anderson Canyon and Sur River; that in and by said contract said Highway Commission agreed to pay said Pollock at the unit prices therein specified for the grading and other work therein provided for, no total sum being specified therein, but the total cost thereof will aggregate not less than $2,500,000; that thereafter, petitioners, the successors to the former members of the Highway Commission, believing that it would be better for the state of California and the people thereof to cancel said contract with Pollock and to suspend the work on said highway and to devote the moneys which otherwise would be used upon said contract to the construction of other highways which are more urgently needed, and which would serve a greater useful purpose, did, on April 24, 1923, enter into an agreement in writing with said Pollock (hereinafter referred to, for convenience, as the "second contract"), a copy of which is attached to the petition; that in and by said last-mentioned agreement petitioners agreed to pay Pollock the sums therein specified, and Pollock agreed, upon the payment thereof, to cancel and terminate said first contract, but unless and until said sums were so paid said first contract was to remain in full force and effect; that in accordance with said second contract petitioners approved a claim which had theretofore been presented by Pollock upon the treasury of the state of California for the sum of $125,000, being the first payment specified in said second contract, which claim was duly approved and the payment thereof ordered by the state board of control and the depart-

ment of finance thereof, and then presented to respondent as controller, and respondent refused to draw his warrant upon the treasurer for the payment of the same. In said second contract, after reciting execution of the first contract, and that Pollock had entered into the performance thereof, and that the Highway Commission desired to terminate the same, it is agreed that Pollock consents to the termination of said first contract upon the payment of the sum of $132,944.37, to be paid to him, $125,000 thereof within five days and the balance within ten days, together with such further sum as shall be due him as thereinafter mentioned. It is then provided that the parties thereto shall continue in the performance of the obligations of said first contract in the manner therein provided until full payment shall have been made to Pollock of said sum of $132,-944.37, and in addition thereto of such unpaid sums as shall be or become due to him according to the unit rates provided therein by reason of the performance thereof from the first day of April, 1923, to the date of the termination therof. Said second contract then continues with the following statement: "It being the intention of the parties hereto to pay said party of the second part [Pollock] the reasonable value of all work performed and materials furnished by him under and by virtue of said agreement [first contract] in accordance with the terms thereof, it being agreed that the reasonable value of said work and materials furnished and supplied up to April 1, 1923, aggregate the sum of $132,-944.37, after allowing all credits and offsets, and that the unit rates provided in said agreement for such work and materials as have been and shall be actually performed and supplied since the first day of April, 1923, to the date of the termination of said agreement constitute the reasonable value thereof."

The respondent filed a general demurrer to the petition and also an answer thereto. The answer alleges that the first contract was duly entered into as required by law and was and is a valid subsisting contract; that work had been partly performed under the same prior to the twenty-fourth day of April, 1923; that any cancellation thereof sought to be made by the second contract was not, and was not intended, as an amendment of or change in the terms of said first contract, or as a change of the route therein specified, but

on the contrary, was, and was intended to be, an abandonment of the construction of said highway between Carmel and San Simeon; that said sum of $132,944.37 proposed to be paid was not in payment for work done or materials furnished under the first contract, but that at least $123,000 thereof was and is, and was and is intended to be, payment to Pollock as a consideration for his relinquishment of his rights under said first contract; that said sum of $123,000 was not, nor was any part thereof, due to Pollock on account of any work done or any materials furnished or any services rendered by him to the state of California, but that the same was, and was intended to be, a gift, gratuity, bonus, or extra compensation or allowance to Pollock for the purpose of inducing him to surrender and relinquish his rights under the first contract after the same had been partly performed; that there was, on April 1, 1923, due Pollock for work done and materials furnished theretofore under said first contract a sum not in excess of $10,000, for which respondent is and has been ready and willing to issue his warrant as controller upon the presentation to him of a claim therefor prepared as required by law, but that no such claim has been presented.

When this case came on for hearing an effort was made to frame a stipulation which would dispose of the questions of fact tendered by the answer. This was not entirely successful, but it was conceded by petitioners that the amount due to Pollock for work and materials done and furnished up to April 1, 1923, under the first contract, amounts to but a small portion of the $132,944.37 proposed to be paid to him under the second contract. The respondent contends that the sum of $132,944.37 now proposed to be paid to Pollock is made up, roughly speaking, of $9,000 which has been actually earned by and is due to Pollock under the first contract, and $123,000 which is proposed to be paid to him as a bonus or extra compensation or as a consideration for his relinquishment of his rights under said first contract. The petitioners, on the other hand, while conceding that the sum is not due to Pollock under the terms of the first contract, take the position that it does represent the sum which the Highway Commission has deemed reasonable for the work done, under all the circumstances, taking into consideration the fact that the contractor has expended large sums of

money in providing equipment and supplies and preparing himself for the performance of the entire contract, in the reasonable expectation that the amounts thus expended by him would eventually be absorbed and compensated by the aggregate amounts to be paid him at the unit prices for the performance of the entire contract. To illustrate: If the contractor expended $150,000 in "overhead" expenditures under a contract for the construction of fifty miles of highway, his overhead charges therefor would amount to $3,000 per mile, and would be taken into consideration on that basis in arriving at the unit prices to be paid him for the work. But if, after entering into such a contract and incurring such expenditures, the contract were to be terminated when he had constructed but one mile of highway, the "overhead" chargeable thereto would be $150,000 per mile.

After a vain effort to arive at a definite and satisfactory stipulation which should eliminate all issues of fact herein, it was suggested by the chief justice, and acquiesced in by the parties, that the case should be argued and submitted as if upon demurrer to the answer; in other words, upon the assumption that the facts stated in the answer are true. Further consideration of the allegations and denials of the petition and answer, in the light of the respective assertions and admissions of counsel at the hearing, convinces us that there are no material issues *of fact* standing in the way of a solution of the present controversy. The parties are in substantial agreement as to the essential facts, and their differences relate rather to the interpretation to be placed upon those facts and the conclusions of law to be drawn therefrom. We shall therefore consider the case as upon the demurrer to the petition, which admits the truth of the facts there alleged, interpreting those allegations in the light of the explanations and concessions made by counsel at the hearing. It is thus apparent that a large portion of the sum now proposed to be paid to the contractor has not been earned by him and is not due to him under the terms of the first contract. It is wholly immaterial, for present purposes, whether this portion amounts to $123,000, as claimed, or a less sum. We may, for convenience, assume that there is due him for work done and materials furnished up to April 1, 1923, according to the terms of the first contract the sum

of $12,944.37, and that the petitioners are now proposing to pay him $120,000 in addition thereto. This $120,000 is claimed by respondent to be in legal effect a bonus, gratuity, or extra compensation, and is contended by petitioners to represent, when added to that which is due under the first contract, the reasonable value of the work already done, estimating that value in the light of the fact that the termination of the contract will require the contractor, in effect, to charge the "overhead" for the entire job against the small amount of work which was done thereon prior to April 1st. It is clear that the $120,000 is not due or owing to the contractor from the state of California unless it is by virtue of the second contract. [1] The question of validity of the second contract involves a consideration of two questions: Has the Highway Commission authority and power to cancel by agreement a valid and subsisting contract for the construction of a state highway? and, Is it authorized to expend state highway funds for such purpose?

The provisions of law relating to the powers and duties of the Highway Commission are to be found in various places. The first "State Highways Act" was adopted in 1909 (Stats. 1909, p. 647) and amended in 1915 (Stats. 1915, p. 686). The second "State Highways Act" was adopted in 1915 (Stats. 1915, p. 650), and it, among other things, adopted by reference various provisions of the first State Highways Act. The third state highways measure was adopted in 1919 and 1920 in the form of amendments to the constitution (Const., art. XVI, secs. 2, 3) and it, in turn, adopted by specific reference certain provisions of the State Highways Act of 1915, and by general reference various other provisions thereof. It provided specifically for the construction, among others, of the state highway from Carmel to San Simeon, which includes the portion here under consideration. Section 363f of the Political Code, adopted in 1921, created the present California Highway Commission, as the successor to the duties, powers, purposes, responsibilities, and jurisdiction theretofore vested in the appointed members of the advisory board to the department of engineering, who formerly composed a subdivision of the department of engineering designated as the California State Highway Commission. The statutory provisions prescribing the

powers, duties and responsibilities of the department of engineering are to be found in the Statutes of 1907, page 215; Statutes of 1909, page 558; Statutes of 1911, page 823; Statutes of 1915, pages 630 and 898, and Statutes of 1917, pages 541 and 690. By section 8 thereof it is provided that ''all public work done by the state, except as otherwise provided by law, shall be under the full control of said department.'' By section 9 thereof it is provided that ''the department of engineering shall take and have full possession and control of all roads and highways which have been declared and adopted state roads and state highways, and all state roads and state highways which may hereafter be acquired and constructed. All expenditures by the state for highway purposes, except as otherwise hereafter provided by law, shall be under the full charge of the department of engineering, and all moneys appropriated for such purpose shall be made payable upon the proper demand of said department, when approved and audited by the state board of control. . . . It shall have power to . . . do all things necessary . . . to properly care for and manage the roads under the charge of the department. . . . Said California Highway Commission shall have the supervision and direction of all state roads and state highways now existing and the improvement, maintenance, repair and protection thereof, and have charge of and perform all other duties relating to state roads and state highways which may be imposed upon said commission by the said advisory board.'' The statutory provisions prescribing the contract law governing the state department of public works (formerly the state department of engineering) are to be found in the Statutes of 1909, page 656, and Statutes of 1915, page 1306. Section 1 thereof requires the preparation of full, complete, and accurate plans, specifications, and estimates of cost prior to the commencement of any public work (including state highway construction). Sections 2 and 3 thereof prescribe the manner and mode of procuring bids and letting contract for such work. It is therein provided that ''all contracts shall provide that such department of engineering may, as hereinafter provided, and on the conditions stated, make any change in the plans and specifications.'' Section 4 provides that ''after the contracts or contract are let no change shall be made to increase or diminish the cost of any

contract in excess of $500 except upon the approval of the advisory board of the department of engineering, and then only upon additional plans and specifications and estimates of cost being filed and approved and amended contracts entered into and filed with the original contract; . . . provided that the bidders shall have had an equal opportunity of knowing what the terms proposed by the department of engineering for the performance of such work shall be." Section 6 provides for the making of progress payments under contracts upon estimates made and approved by the department and audited by the board of examiners "but no payment shall be made in excess of ninety per cent of the percentage of the actual work completed, to which has been added one-half of the value of materials delivered on the ground and unused. The department of engineering shall withhold not less than ten per cent of the contract price until final completion and acceptance of the work." Section 8 prescribes the terms and conditions upon which the department may take over and itself complete the work under a contract which is being neglected by the contractor, charging the cost thereof against such contractor. Section 2 of the third highway measure (Const., art. XVI, sec. 2) provides that "all provisions of section 8 of said 'State Highways Act' of 1915 and of any amendment thereof and any of the provisions of said act or of any amendment thereof relating to the selection of routes, character of construction of highways, manner of conducting work thereon, powers and duties of officers in connection therewith . . . shall, so far as applicable, apply to the bonds herein authorized and all highways constructed hereunder." Sections 2 and 3 contain the provision that, "All provisions of this section shall be self-executing and shall not require any action in furtherance thereof, but this shall not prevent such legislative action. . . . Nothing in this constitution contained shall be a limitation upon the provisions of this section." Said section 2 also provides that "the moneys in said 'Third State Highway Fund' shall be used by the state department of engineering for the acquisition of rights of way for and the acquisition, construction and improvement of uncompleted portions [of the state highways theretofore provided for] and also for the acquisition of the rights of way for and the acquisition, construction and improvement"

of certain state highways therein enumerated, including the one here under consideration. Section 8 of the State Highways Act of 1915 provides that "the state department of engineering in the name of the people of the state of California, may purchase or receive by donation or dedication from counties or from public or private persons, or it may lease, any right of way, rock quarry, or land, necessary or proper for the construction, use, improvement or maintenance of said state highway. . . . The department of engineering, *in accordance with law,* shall have power and authority to purchase, sell, exchange, lease or otherwise acquire and *do all other things necessary or proper* in the construction, improvement or maintenance of said state highway. The department of engineering, *in accordance with law,* shall have power and authority to purchase, lease, or erect plants for manufacture of cement, crushed rock and other materials used in road or highway work, and also the power to dispose of said plants when no longer required for such purposes.'' (Italics added.)

Petitioners argue, in effect, that the state in its contracts with private individuals is governed by the same rules as to its rights and liabilities thereunder as are private individuals (citing *Chapman* v. *State of California,* 104 Cal. 690 [43 Am. St. Rep. 158, 38 Pac. 457]) ; that the state has the same power which the private individual possesses to breach its contract, and upon such breach becomes liable to render compensation as does an individual (citing *Lord* v. *Thomas,* 64 N. Y. 109; *People* v. *Stephens,* 71 N. Y. 549, and *Chapman* v. *State, supra*) ; that upon breach by the owner of the construction contract such as the first contract herein, the contractor may choose between two remedies: He may sue to recover the amount due him for work performed up to the time of the breach, together with damages for the breach, or he may elect to treat the contract as abandoned and recover the reasonable value of the services performed by him without regard to the contract price (citing *Connell* v. *Higgins,* 170 Cal. 541 [150 Pac. 769] ; Donnelly on Law of Public Contracts, p. 358). They argue that this last situation is, in effect, anticipated and provided for by their second contract herein; that, in effect, they have undertaken to breach their contract and to pay to the contractor the reasonable value of the services performed

by him, independent of the contract price, without compelling him to sue therefor. All of these propositions may be conceded, but it does not follow therefrom that petitioners have power or authority to cancel or terminate their contract with Pollock after the same has been legally executed and before it was performed. A private individual may grant authority to an agent to execute in his behalf a contract for a certain improvement, but it does not follow therefrom that the agent has authority to commit his principal to a breach of such contract and thus subject the principal to liability for damages. ''In general it may be said that an agent employed to buy has no authority to sell, and *vice versa;* that an agency for accepting or indorsing bills or notes does not authorize the agent to purchase or sell goods for his principal; that an agent authorized to sell and convey the property of his principal cannot, as against the principal, convey it in trust for the payment of his own debts; and that an authority to collect or secure a claim of the principal, however general in its terms, is not an authority to make a purchase for the principal of the property of the debtor for the security of the claim. An agent authorized to sell the property of his principal when manufactured has no authority to sell it before it is manufactured, and by parity of reason an agent who has authority to sell new pattern goods to be manufactured has no authority to sell old pattern goods which are not being manufactured and cannot be made except at a loss.'' (1 Cal. Jur., p. 718, and cases cited.) [2] A grant of authority to an agent to execute a contract in behalf of his principal contemplates the performance of such contract, not its breach, and authority to breach a contract is not implied from a mere grant of authority to execute such contract.

[3] The rule that a state in its contract with individuals is subject to the same rules and liabilities as individuals is itself subject to certain limitations. When an individual enters into a contract he is a free agent and may determine for himself whether he will continue therewith or stand the damages for a breach thereof, or he may by agreement with the other party modify or abrogate the same. After a performance in full or in part he may pay the other party merely what he is entitled to, or may pay him more by way of extra compensation or as a gratuity. When, however,

the state empowers an officer or board to enter into a contract on its behalf, whereby it is to have certain rights and liabilities, and the officer or board has entered into such contract, no officer or board may thereafter act or speak for the state in the matter of such contract, either for the enforcement or termination thereof, unless expressly or impliedly authorized by the state so to do. By the execution of such an authorized contract the state acquires certain legal rights and incurs certain liabilities which are fixed and ascertained, or ascertainable. Thereafter no one can either increase or diminish the rights of the state or increase or reduce its liabilities thereunder unless he has been vested with authority so to do by express grant or clear implication. The state having directed or authorized the making of the contract contemplates its performance and, as in the case of private individuals, the authority to breach such a contract is not to be implied from the mere grant of authority to execute the same. When, as here, the contract has been lawfully executed and has been performed in part, the amount which the contractor is entitled to receive for the work done is fixed by the terms of the contract. For the Commission to pay him more than the contract calls for would, therefore, be to make to him a gift of public moneys, unless the Commission has the power and authority to first breach the contract.

That the Highway Commission is vested with broad general powers over state highways and the expenditures of money provided therefor must be conceded. By the department of engineering law it is given "full possession and control" over all state highways and "all expenditures by the state for highway purposes . . . shall be under the full charge of the department." The contract law of the department of public works, on the other hand, prescribes specifically and in detail the manner in which a contract for road construction may be let, prescribes the terms and conditions upon which it may be modified, and imposes express limitations upon the authority of the Commission to make payments for work done under such a contract. Great reliance is placed by petitioners upon the provisions found in sections 2 and 3 of article XVI of the constitution (the third state highway and bond measure) that "Nothing in this constitution contained shall be a limitation upon the

provisions of this section." We are unable to subscribe to the view that this provision was intended to wipe out all other constitutional limitations and restrictions upon the powers and authority of the Highway Commission, or that it can fairly be construed to have that effect. These two sections are primarily concerned with and almost wholly devoted to provisions for the issuance and sale of state highway bonds and the payment of principal and interest thereon. A consideration of all the provisions of these two sections, in the light of the surrounding circumstances attendant upon their adoption, which were and are matters of common knowledge, leads to the conclusion that the quoted provision was inserted therein for the primary purpose of rendering the bonds to be issued thereunder more salable by dispelling doubts as to their validity. This conclusion is strengthened by a reference to the arguments for and against the adoption of section 3 in the official pamphlet which was distributed to voters at the general election of 1920. It is apparent therefrom that both the proponents and the opponents of this measure assumed that the whole purpose and effect thereof was to authorize the payment of a higher rate of interest upon the bonds and to shift the burden of interest payments from the counties to the state. We are convinced that the quoted provision is not to be construed as if it read: "Nothing in this constitution contained shall be a limitation upon the powers of the highway commission." Such a construction would give rise to an anomalous situation which would be without parallel or precedent, so far as we are advised, in the entire structure of our government. The difference is obvious between the situation herein and that under consideration in *Pacific Tel. etc. Co.* v. *Eshelman,* 166 Cal. 640 [Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652, 137 Pac. 1119], where the powers claimed by the Railroad Commission were definitely described and delimited and had been *expressly granted* to it by the legislature pursuant to the constitutional provision that *"the authority of the legislature to confer such additional powers is expressly declared to be plenary and unlimited* by any provision of this constitution." (Italics added.) Article IV, section 32, of the constitution provides: "The legislature shall have no power to grant, or authorize any county or municipal authority to grant, any

extra compensation or allowance to any public officer, agent, servant, or contractor, after service has been rendered, or a contract has been entered into and performed, in whole or in part, nor to pay, or to authorize the payment of, any claim hereafter created against the State, or any county or municipality of the State, under any agreement or contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void.'' This section has remained unchanged in the constitution since the adoption thereof, and it is not to be lightly inferred that the Highway Commission has been vested by implication with a power which is thus expressly denied to the legislature itself.

With respect to the question of the right of petitioners to use state highway funds for the purpose here proposed, we note that the first state highway measure provides that ''the moneys placed in the state highway fund . . . shall be used exclusively for the acquisition of rights of way for and the acquisition and construction of said system of state highways.'' The second state highway measure provides that ''of the moneys placed in the second state highway fund . . . the sum of twelve million dollars . . . shall be used exclusively for the acquisition of rights of way for and the acquisition, construction and improvement of the uncompleted portions of the system of state highways prescribed by said ''State Highway Act.' And . . . the sum of three million dollars . . . shall be used exclusively for the acquisition of rights of way for and the acquisition, construction and improvement of certain extensions from said system of state highways'' therein enumerated. The third state highway measure provides that ''the moneys in said 'third state highway fund' shall be used . . . for the acquisition of rights of way for and the acquisition, construction and improvement of uncompleted portions of the system of state highways . . . [theretofore provided for and certain extensions thereof] *provided, however*, that twenty million dollars of the moneys in said 'third state highway fund' . . . shall be used for the completion of all the system of state highways'' provided for in the former acts. The petitioners contend that the money here proposed to be paid to the contractor may be regarded as used for the construction of a state highway for the reason that it represents the

reasonable value of the work done by the contractor, esti-
mated in view of the termination of his contract. But
concededly it does not represent the reasonable value of the
work done except upon the assumed premise that the state
shall have first breached the contract and thus conferred
upon the contractor a cause of action which he would not
otherwise possess. We are unable to escape from the con-
clusion that of the money here proposed to be paid to the
contractor the major portion represents not compensation
for the construction work heretofore performed or hereafter
to be performed by him, but compensation for the relinquish-
ment by him of his rights under the subsisting contract, and
cannot therefore be regarded as used for the acquisition,
construction or improvement of a state highway.

There is no suggestion herein that the petitioners are
actuated by any motives other than the sincere desire to
obtain the greatest possible benefit to the people of the
state of California from the expenditure of the highway
funds. But in contemplation of law it is wholly immaterial
that the present highway commissioners had nothing to do
with the letting of the contract which they are now seek-
ing to terminate. In legal contemplation the Highway Com-
mission now seeking to terminate that contract is the same
Highway Commission which executed it. The policy of the
state does not contemplate that its agents shall enter into
improvident contracts in its behalf and then use its funds
to purchase release therefrom.

[4] Petitioners' next contention is that if it be held that
the proposed payment cannot lawfully be made out of the
state highway funds, nevertheless "the highway commission
still has at its disposal the federal aid fund that it may
spend practically as it wishes." This contention was re-
solved adversely to petitioners in the case of *Ellis* v.
*Stephens,* 185 Cal. 720 [198 Pac. 403]. Petitioners assert
that what was there said upon this point is *obiter dictum.*
[5] Without pausing to determine whether or not it was
*obiter,* it will suffice to say that we are satisfied with the
reasoning of that opinion upon this point (185 Cal. 725, 727
[198 Pac. 407]), and with the validity of the conclusion
there reached and summarized in the following language:
"It is also clear that the legislation authorizing the respond-
ent board [Highway Commission] to designate the fund into

which this money should be paid contemplated that it should be paid into funds which, under the statute organizing said board, are under the control of that board *for the creation, maintenance and repair of state highways.*'' (Italics added.)

Finally, it is suggested that the controller has no discretion or authority to question the validity of the proposed payment to the contractor. The second State Highway Act contains a provision, adopted by reference in the third state highway measure, to the effect that the controller shall draw warrants ''upon demands made by the department of engineering [Highway Commission] and allowed and audited by the state board of control.'' The demand here under consideration having been so made, allowed, and audited, it is said to be the plain mandatory duty of the respondent not to question the same but to draw his warrant therefor. The various provisions of section 433 of the Political Code seem to indicate that the controller's duties and responsibilities are not so narrowly restricted, but it is not necessary to here determine their precise nature and extent. **[6]** The writ of mandate is, in a measure at least, a discretionary writ, and it will not be granted where its enforcement would work an injustice or accomplish a legal wrong. (*People* v. *Murphy,* 20 Cal. App. 398 [129 Pac. 603]; *Devlin* v. *Donnelly,* 20 Cal. App. 495 [129 Pac. 607].) It will not issue to compel an auditor to draw his warrant for an illegal claim even though it has been audited and allowed by the board which is charged with that duty and responsibility. (*Walton* v. *McPhetridge,* 120 Cal. 440 [52 Pac. 731].)

We are of the opinion that the demurrer of respondent to the petition herein should be and it is hereby sustained, and the order to show cause discharged.

Lennon, J., Kerrigan, J., Waste, J., Seawell, J., Lawlor, J., and Wilbur, C. J., concurred.